**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FONDS DES MISSIONS,                            :
                                               :
          Plaintiff,                           :        Civil Action No.:      26-970 (RC)
                                               :
     v.                                        :        Re Document No.:    2
                                               :
UNITEDHEALTH GROUP INC.,                        :
                                               :
          Defendant.                           :

## MEMORANDUM OPINION

**DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION; DENYING PLAINTIFF'S**
**MOTION FOR A PERMANENT INJUNCTION**

## I. INTRODUCTION

Plaintiff Fonds des Missions ("Mission Fund") is a Canadian charitable corporation and a

shareholder of Defendant UnitedHealth Group Inc. ("UnitedHealth Group" or "UHG"), a

national healthcare company. Late last year, Mission Fund submitted a proposal to UnitedHealth

Group for its Board of Directors to publish a report describing the healthcare consequences of

the company's acquisitions over the last decade. Seeking to put this proposal to a shareholder

vote, Mission Fund requested that UnitedHealth Group include it in the proxy materials that the

company plans to circulate to other shareholders in advance of its annual shareholder meeting,

which will take place in June 2026. But UnitedHealth Group decided to omit the proposal from

its proxy materials, invoking a Securities and Exchange Commission rule that allows public

companies to exclude proposals that relate to a company's ordinary business operations. More

than a month later, Mission Fund sued UnitedHealth Group and moved for a preliminary and

permanent injunction to compel it to include the proposal in the proxy materials.

For the reasons below, the Court denies Mission Fund's motion for a preliminary

injunction. Based on the current record, Mission Fund has not made a clear showing that it is

entitled to emergency injunctive relief.  UnitedHealth Group further urges the Court to reach the merits of Mission Fund's claim and, on the existing record, dismiss the case with prejudice.  But at this preliminary juncture, the Court decides instead to dismiss Mission Fund's motion for a permanent injunction without prejudice.

## II.  BACKGROUND

### A.  Regulatory Background

#### 1.  Proxy Voting

"Public company governance, at its highest level, occurs through annual and special shareholders meetings."  *Institutional S'holder Servs. Inc. v. SEC*, 718 F. Supp. 3d 7, 11 (D.D.C. 2024).  At these meetings, "shareholders vote on a variety of issues, including selecting directors, setting executive pay, and approving or rejecting major transactions, such as mergers and acquisitions."  *Id*.  Although shareholders can vote on such matters in person, they more commonly do so by empowering other attending shareholders—known as "proxies"—to submit votes on their behalf.  *Trinity Wall St. v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 334 (3d Cir. 2015).  "As a typical corporation's shareholders became increasingly numerous and widely distributed, the proxy-voting system became 'an indispensable part of corporate governance.'"  *As You Sow v. Chubb Ltd.*, No. 26-cv-734, 2026 WL 879666, at *1 (D.D.C. Mar. 31, 2026) (quoting *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*, 821 F. Supp. 877, 881 (S.D.N.Y. 1993)).

In advance of shareholder meetings, public companies that solicit proxies must publish and distribute a "proxy statement" to all shareholders.  *Trinity Wall St.*, 792 F.3d at 334.  The proxy statement is an "informational package that tells shareholders 'about items or initiatives on which [they] are asked to vote.'"  *Id.* (quoting *Apache Corp. v. Chevedden*, 696 F. Supp. 2d 723,

727 (S.D. Tex. 2010)).  Along with the proxy statement, companies send shareholders a "proxy card, on which the shareholder may submit his proxy."  *Apache Corp.*, 696 F. Supp. 2d at 727. Together, the proxy statement and proxy card are referred to as the "proxy materials."  *KBR Inc. v. Chevedden*, 776 F. Supp. 2d 415, 419 (S.D. Tex. 2011).

2.  Shareholder Proposals

Through the Securities Exchange Act of 1934, Congress delegated to the Securities and Exchange Commission ("SEC") "the task of regulating proxy solicitations and thereby regulating one important avenue of management's communication with shareholders."  *Amalgamated Clothing*, 821 F. Supp. at 881.  "The SEC's proxy rules are concerned with assuring full disclosure to investors of matters likely to be considered at shareholder meetings."  *Trinity Wall St.*, 792 F.3d at 335 (citation modified).  To that end, the SEC adopted "Rule 14a-9, which prohibits 'false or misleading' statements made in any proxy statement, form of proxy, notice of meeting or other communication."  *Amalgated Clothing*, 821 F. Supp. at 882 (quoting 17 C.F.R. § 240.14a-9(a)).  The SEC has interpreted this rule "to require companies to provide shareholders with the opportunity to submit proposals to management for inclusion in the corporation's proxy material[s]."  *Id.*

Another SEC rule, Rule 14a-8, furthers that objective by "afford[ing] shareholders access to management proxy solicitations to sound out management views and to communicate with other shareholders on matters of major import."  *Id.* (citation modified); *see also* 17 C.F.R. § 240.14a-8.  "The idea was to provide shareholders a way to bring before their fellow stockholders matters of shareholder concern that are proper subjects for shareholders' action . . . and to have proxies with respect to such proposals solicited at little or no expense to the security holder."  *Trinity Wall St.*, 792 F.3d at 335 (citation modified).  Under Rule 14a-8, a

3

shareholder who meets certain eligibility and procedural requirements—which are not in dispute here—can force a company to "include [his] proposal in its proxy statement and identify the proposal in its form of proxy" at the company's expense.  17 C.F.R. § 240.14a-8.

Rule 14a-8 "does not create an open forum for shareholder communication," however, but "restricts the company[]subsidy to shareholders who offer 'proper' proposals." *Trinity Wall St.*, 792 F.3d at 336 (citation modified).  "A 'proper' proposal is one that doesn't fit within one of Rule 14a-8's exclusionary grounds." *Id.*  In addition to the procedural grounds for exclusion referenced above, Rule 14a-8 "lists thirteen substantive reasons why a company may exclude [a shareholder's] proposal" from its proxy materials.  *Heritage Found. v. Airbnb, Inc.*, No. 25-cv-676, 2026 WL 395797, at *4 (D. Del. Feb. 12, 2026).  Relevant here, Rule 14a-8(i)(7) allows a company to exclude a proposal if it "deals with a matter relating to the company's ordinary business operations."  17 C.F.R. § 240.14a-8(i)(7).  "This exemption is premised on the notion that 'management cannot exercise its specialized talents effectively if corporate investors assert the power to dictate the minutiae of daily business decisions.'"  *Grimes v. Centerior Energy Corp.*, 909 F.2d 529, 532 (D.C. Cir. 1990) (quoting *Med. Comm. for Human Rts. v. SEC*, 432 F.2d 659, 679 (D.C. Cir. 1970), *vacated as moot*, 404 U.S. 403 (1972)).

If a company wants to exclude a proposal from its proxy materials, it must first "notify the shareholder in writing of the problem with the proposal." *Trinity Wall St.*, 792 F.3d at 336 (citing 17 C.F.R. § 240.14a-8(f)(1)).  "The company must then file its reasons for excluding the proposal with the SEC's Division of Corporation Finance staff, which has traditionally commented favorably or unfavorably on the exclusion." *As You Sow*, 2026 WL 879666, at *2.  "A shareholder dissatisfied with the staff's response can . . . pursue its rights against the company in federal court." *Trinity Wall St.*, 792 F.3d at 337.

4

### B.  Factual Background

"The following facts are alleged in the Complaint or drawn from declarations in the record that are not disputed in relevant part, except where otherwise noted."  *Postal Police Officers Ass'n v. USPS*, 502 F. Supp. 3d 411, 415 (D.D.C. 2020).  Plaintiff Mission Fund, known until this year as Durocher Fund, is a "Canadian registered charitable corporation constituted for the purposes of supporting, developing and administering missionary, humanitarian, charitable, and religious works related to, or founded by, the . . . Congregation of the Sisters of the Holy Names of Jesus and Mary."  Compl. ¶ 3, ECF No. 1.  Mission Fund "regularly submits shareholder proposals" to companies in which it owns stock, "an activity consistent with a core value of fostering dutiful corporate governance."  Pl.'s Mot. Injunctive Relief ("Pl.'s Mot."), Decl. of Sister Linda Haydock ("Haydock Decl.") ¶ 2, ECF No. 2-2.

One such company is Defendant UnitedHealth Group Inc., a "diversified healthcare company that operates across the United States in many parts of the wider healthcare industry, including in insurance, care delivery, pharmacy services, and data analytics."  Def.'s Opp'n to Pl.'s Mot. ("Def.'s Opp'n"), Decl. of Faraz A. Choudhry ("Choudhry Decl.") ¶ 4, ECF No. 9-1; *see also* Haydock Decl. ¶ 2 (noting that Mission Fund owns common stock issued by UnitedHealth Group).  UnitedHealth Group consists of multiple subsidiaries across two main platforms: (1) UnitedHealthcare, which provides a range of health benefits, including health insurance, and (2) Optum, which provides medical care, pharmacy, data, technology, and financial services.  Choudhry Decl. ¶ 4.

On December 15, 2025, Mission Fund submitted a shareholder proposal to UnitedHealth Group.  *See* Haydock Decl. Ex. 2, Dec. 15, 2025 Letter at 1, ECF No. 2-4; *id.* Ex. 1, Mission Fund Proposal, ECF No. 2-3.  Mission Fund requested that UnitedHealth Group include the

proposal in the proxy materials for its upcoming annual shareholder meeting, which will take place virtually on June 1, 2026.  *See id.*; Choudhry Decl. ¶ 14.  The "resolved" clause of Mission Fund's proposal reads:

> Resolved: UnitedHealth Group Inc. . . . shareholders request that its Board of Directors publish a report, at reasonable expense and omitting proprietary and confidential information, describing the healthcare consequences of its acquisitions over the past 10 years.

Mission Fund Proposal at 1.

In the supporting statement to its proposal, Mission Fund asserts that in recent years, UnitedHealth Group "has pursued a strategy of vertical integration, acquiring companies in parts of the healthcare value chain other than insurance."  *Id.*  Mission Fund further observes that "following a series of acquisitions," the company has become a top employer of doctors in the United States,[1] a top processer of prescriptions nationwide, and a leader in medical payment processing, analytics, revenue management, and home healthcare services.  *Id.*  According to Mission Fund, UnitedHealth Group's "vertical integration creates risks for the healthcare system," including by reducing patient choice and access to care, potentially impairing patient care, and creating perverse pricing incentives among UnitedHealth Group subsidiaries.  *Id.*  Mission Fund finally suggests that its requested report could, at UnitedHealth Group's discretion, "include information related to trends in the use of prior authorizations, changes in network

---

[1] Mission Fund specifically claims that UnitedHealth Group's "subsidiary Optum employs more doctors than any other organization."  Mission Fund Proposal at 1.  UnitedHealth Group disputes this, noting that "Optum and the practices it manages employ fewer than 9,000 physicians, significantly fewer than, for example, Kaiser Permanente."  Def.'s Opp'n at 30.

design, reimbursement differentials between UHG-owned providers and facilities and those that are independent, and pre- and post-integration patient outcome data." *Id.* at 2.

On January 30, 2026, UnitedHealth Group notified the SEC and Mission Fund of its decision to exclude Mission Fund's proposal "pursuant to Rule 14a-8(i)(7) because the Proposal pertains to the ordinary business of the Company and seeks to impermissibly micromanage the Company." Haydock Decl. Ex. 4, Jan. 30, 2026 Letter at 2, ECF No. 2-6. Mission Fund responded on February 10, arguing that its proposal falls outside of Rule 14a-8(i)(7) because the topic of its requested report "is a significant policy issue transcending ordinary business" and one on which shareholders could offer their views without micromanaging UnitedHealth Group's operations. *Id.* Ex. 5, Feb. 10, 2026 Letter at 1–3, ECF No. 2-7. On February 13, the SEC staff issued a "no-action" letter to the parties, stating that "[b]ased solely" on UnitedHealth Group's representation to the agency that "it has a reasonable basis to exclude" Mission Fund's proposal, it would "not object if the Company excludes the Proposal from its proxy materials."[2] *Id.* Ex. 6, Feb. 13, 2026 Letter, ECF No. 2-8.

---

[2] Until a few months ago, the SEC Division of Corporation Finance's practice was to "comment[] favorably or unfavorably" on a company's decision to exclude a shareholder proposal under Rule 14a-8. *As You Sow*, 2026 WL 879666, at *2. In November 2025, however, the Division announced that "[d]ue to current resource and timing considerations following [a] lengthy government shutdown," it would forego expressing substantive views on Rule 14a-8 submissions during the 2025–26 proxy season. Sec. & Exch. Comm'n, Statement Regarding the Division of Corporation Finance's Role in the Exchange Act Rule 14a-8 Process for the Current Proxy Season (Nov. 17, 2025), https://www.sec.gov/newsroom/speeches-statements/statement-regarding-division-corporation-finances-role-exchange-act-rule-14a-8-process-current-proxy-season [perma.cc/W3GH-4DP4]. For most exclusions, including those based on Rule 14a-8(i)(7), the Division stated that it would respond with a letter indicating that, "based solely on the company's or counsel's representation" that the company "has a reasonable basis to exclude the proposal based on the provisions of Rule 14a-8," it would not object to the company's exclusion of the proposal from its proxy materials. *Id.* That is precisely what occurred here.

### C. Procedural Background

Over a month later, on March 20, 2026, Mission Fund filed the instant lawsuit, seeking to overturn UnitedHealth Group's decision to exclude Mission Fund's proposal under Rule 14a-8(i)(7).  Mission Fund claims that this decision violates Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a), which renders unlawful the solicitation of proxies in contravention of the SEC's rules, as well as Rule 14a-8(a), 17 C.F.R. § 240.14a-8(a).  Compl. ¶ 20.  Three days later, Mission Fund moved for preliminary and permanent injunctive relief to compel UnitedHealth Group to include the proposal in the proxy materials that the company plans to circulate in advance of the June 2026 annual shareholder meeting.  UnitedHealth Group has represented to the Court that it intends to file its proxy statement with the SEC on or before April 22, 2026, meaning that it will need to send the finalized statement to a professional printer service no later than April 20, 2026.  *See* Def.'s Opp'n at 14.

### III.  LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  A litigant seeking emergency relief must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest."  *Id.* at 20.  To obtain a preliminary injunction, "the movant has the burden to show that all four [*Winter*] factors, taken together, weigh in favor of the injunction."  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).

A permanent injunction, similarly, "is a drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). To obtain a permanent injunction, a plaintiff must demonstrate (1) "that it has suffered an irreparable injury," (2) "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury," (3) "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted," and (4) "that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "While the irreparable-harm requirement is recited in the past tense, it is clear that future harm may qualify." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F. Supp. 3d 45, 55 (D.D.C. 2021). The standard for a permanent injunction is "essentially the same" as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show "actual success" on the merits, rather than a mere "likelihood of success." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987); *see also 12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, No. 17-cv-2000, 2019 WL 450676, at *9 (D.D.C. Feb. 4, 2019).

## IV. ANALYSIS

The Court begins by addressing Mission Fund's motion for a preliminary injunction. Finding that Mission Fund is not entitled to preliminary injunctive relief, the Court next considers Mission Fund's motion for a permanent injunction, which the Court decides to deny without prejudice at this early stage.

## A. Preliminary Injunction

Turning first to Mission Fund's request for preliminary injunctive relief, the Court finds that Mission Fund has not met its burden of showing a likelihood of success on the merits. As discussed, the operative language of Mission Fund's proposal states:

> Resolved: UnitedHealth Group Inc. . . . shareholders request that its Board of
> Directors publish a report, at reasonable expense and omitting proprietary and
> confidential information, describing the healthcare consequences of its
> acquisitions over the past 10 years.

Mission Fund Proposal at 1.  UnitedHealth Group is entitled to exclude this proposal from its proxy materials if it "deals with a matter relating to the company's ordinary business operations."  17 C.F.R. § 240.14a-8(i)(7).  Below, the Court reviews SEC guidance and caselaw pertaining to Rule 14a-8(i)(7) and then considers whether Mission Fund's proposal falls outside of this exclusion.  At this point, the Court cannot conclude that it does.

"[A] failure to show a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016).  Accordingly, the Court denies Mission Fund's motion for a preliminary injunction without considering the other *Winter* factors.  *Cf. As You Sow*, 2026 WL 879666, at *5.

### 1.  Rule 14a-8(i)(7)

The "ordinary business" exclusion has been labeled the "most perplexing" of Rule 14a-8's substantive bars.  *Trinity Wall St.*, 792 F.3d at 337 (citation omitted).  This is largely due to "the opaque term 'ordinary business,' which is neither self-defining nor consistent in its meaning across different corporate contexts."  *Id.*  "There are few cases addressing Rule 14a-8(i)(7)," so "to glean its scope, courts often look to SEC guidance."  *As You Sow*, 2026 WL 879666, at *5 (citation modified).  As both a "rule-maker" and an "umpire," the SEC has issued various forms of guidance concerning Rule 14a-8(i)(7), which the Court summarizes below.  *Trinity Wall St.*, 792 F.3d at 337.

10

### a. SEC Interpretive Releases

First, the SEC has issued several interpretive "releases" providing formal commentary on the ordinary business exclusion, which were adopted through notice-and-comment rulemaking. *See* Adoption of Amendments Relating to Proposals by Security Holders, Exchange Act Release No. 12,999, Investment Company Act Release No. 9,539, 41 Fed. Reg. 52994 (Dec. 3, 1976) ("1976 Release"); Amendments to Rule 14a-8 Under the Securities Exchange Act of 1934 Relating to Proposals by Security Holders, Exchange Act Release No. 20,091, 48 Fed. Reg. 38218 (Aug. 23, 1983) ("1983 Release"); Amendments to Rules on Shareholder Proposals, Exchange Act Release No. 40,018, Investment Company Act Release No. 23,200, 63 Fed. Reg. 29106 (May 28, 1998) ("1998 Release").  The parties here focus their analyses on the 1976 and 1998 Releases, so the Court will follow their lead.

In the 1976 Release, the SEC announced that it would begin interpreting the ordinary business exclusion "somewhat more flexibly than in the past."  41 Fed. Reg. at 52998. Lamenting that the exclusion had on occasion "been relied upon to omit proposals of considerable importance to security holders," the SEC explained that the term "ordinary business operations" would henceforth be construed to encompass "business matters that are mundane in nature and do not involve any substantial policy or other considerations," but not "matters which have significant policy, economic or other implications inherent in them."  *Id.*

In the 1998 Release, the SEC affirmed its intent to "continue to apply" the standard "originally articulated in the Commission's 1976 release."  63 Fed. Reg. at 29108.  The SEC explained that the "general underlying policy" of the ordinary business exclusion is "to confine the resolution of ordinary business problems to management and the board of directors, since it is impracticable for shareholders to decide how to solve such problems at an annual shareholders

11

meeting." *Id.* The SEC identified "two central considerations" supporting this policy. *Id.* The first, relating to a proposal's "subject matter," is that "[c]ertain tasks are so fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight." *Id.* Still, "proposals relating to such matters but focusing on sufficiently significant social policy issues . . . generally would not be considered to be excludable, because the proposals would transcend the day-to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote." *Id.* The second consideration bears on "the degree to which the proposal seeks to 'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an informed judgment." *Id.*

As another court in this District recently observed, "[a]lthough these releases provide helpful guidance in some respects, they also raise questions" that the D.C. Circuit has not directly addressed. *As You Sow*, 2026 WL 879666, at *6. Chief among them is the level of deference, if any, that this Court should accord to the releases. The parties concur that the releases are entitled to deference under *Auer v. Robbins*, which commands courts to defer to a federal agency's interpretation of its own ambiguous regulation unless the interpretation is "plainly erroneous or inconsistent with the regulation." 519 U.S. 452, 461 (1997); *see also* Def.'s Opp'n at 16; Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. ("Pl.'s Reply") at 2, ECF No. 11. Nevertheless, in *Kisor v. Wilkie*, the Supreme Court later announced a multi-step inquiry that courts must undertake before deferring to an agency's interpretation of its own regulation. 588 U.S. 558, 574–79 (2019). Neither party has comprehensively addressed why the *Kisor* inquiry favors the application of *Auer* deference here.

12

The D.C. Circuit has addressed Rule 14a-8(i)(7) twice—in *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 426, 428 (D.C. Cir. 1992) and *Grimes*, 909 F.2d at 531–32—but neither case expressly considered whether the SEC's releases merit deference.  *See As You Sow*, 2026 WL 879666, at *6.  "Those decisions predate both the SEC's 1998 Release and the Supreme Court's clarification in *Kisor* of the limits on deference to agencies' regulatory interpretations."  *Id.*  Thus, "although the Circuit approvingly noted the SEC's 'understanding,' *Roosevelt*, 958 F.2d at 426, of Rule 14a-8(i)(7) as 'explained' by the 1976 Release, *Grimes*, 909 F.2d at 531, the Circuit has not concluded that all of the releases should be afforded determinative interpretive weight."  *Id.*

Outside of this jurisdiction, the Third Circuit has concluded that the releases are entitled to "deference" because they were "adopted after notice and comment."  *Trinity Wall St.*, 792 F.3d at 337 n.9.  A panel majority of that circuit distilled a "two-part analysis" from the SEC's releases to determine whether a proposal falls within the ordinary business exclusion, explaining:

> Under the first step, we discern the "subject matter" of the proposal. . . . Under the second, we ask whether that subject matter relates to [the company's] ordinary business operations. . . . If the answer to the second question is yes, [the company] must still convince us that [the shareholder's] proposal does not raise a significant policy issue that transcends the nuts and bolts of the retailer's business.

*Id.* at 341 (citation modified).[3]  "But that circuit did not go through the [*Kisor*] steps," which had not yet been announced.  *As You Sow*, 2026 WL 879666, at *7.

---

[3] The panel majority further concluded that, "to shield its proposal from the ordinary business exclusion, a shareholder must do more than focus its proposal on a significant policy issue; the subject matter of its proposal must 'transcend' the company's ordinary business."  *Trinity Wall St.*, 729 F.3d at 346–47.  In other words, the significant policy issue must be "divorced from how a company approaches the nitty-gritty of its core business."  *Id.* at 347.  In contrast, a concurring judge opined that "whether a proposal focuses on an issue of social policy that is sufficiently significant is not separate and distinct from whether the proposal transcends a company's ordinary business."  *Id.* at 353 (Schwartz, J., concurring).  Accordingly, "a proposal

Beyond the matter of deference, this Court agrees with the district court in *As You Sow* that the 1976 Release and the 1998 Release are not entirely consistent.  As that court explained:

> [I]f a shareholder proposal implicates both a significant policy issue and a business's day-to-day operations, how should a court (or a company) determine whether it is excludable under Rule 14a-8(i)(7)?  [There is] some tension between the 1976 and 1998 Releases about that.  According to the 1976 Release, the inquiry is whether the proposal has a "significant policy, economic or other implication[ ] inherent in [it]."  41 Fed. Reg. at 52998.  Put differently, it appears to direct the company to ask whether the proposal "involve[s] *any* substantial policy or other considerations."  *Id.* (emphasis added).  But according to the 1998 Release, such a proposal falls outside the exclusion if it "*focus*[*es*] on sufficiently significant social policy issues" such that the proposal "transcend[s] the day-to-day business matters."  63 Fed. Reg. at 29108 (emphasis added).  This latter articulation appears to require the significant policy issue to be central to the proposal in a way that is not contemplated by the 1976 Release.

*As You Sow*, 2026 WL 879666, at *7.

### b.  SEC Staff Legal Bulletins and No-Action Letters

In addition to interpretive releases, the parties cite legal bulletins, through which the SEC staff periodically offers views on the releases themselves and on Rule 14a-8, as well as no-action letters, through which, until recently, the SEC staff expressed substantive views on companies' decisions to exclude shareholder proposals under Rule 14a-8.  *See supra* note 2.  The legal bulletins do not reflect the views of the SEC itself, but rather "represent interpretations and policies followed by the Division of Corporation Finance."  Staff Legal Bulletins, Sec. & Exch. Comm'n (Feb. 12, 2025), https://www.sec.gov/rules-regulations/staff-guidance/staff-legal-

---

is sufficiently significant 'because' it transcends day-to-day business matters."  *Id.* (quoting 1998 Release, 63 Fed. Reg. at 29108).

In SEC Staff Legal Bulletin No. 14H § C (Oct. 22, 2015), the SEC's Division of Corporation Finance later adopted the view of the concurring judge's view.  Concerned that the *Trinity Wall St.* majority approach could "lead to the unwarranted exclusion of shareholder proposals," the SEC staff clarified that, in its view, "a proposal may transcend a company's ordinary business operations even if the significant policy issue relates to the 'nitty-gritty of its core business.'"  *Id.* (quoting *Trinity Wall St.*, 729 F.3d at 347).

bulletins [perma.cc/NS7Q-ZUZ2].  UnitedHealth Group argues that the legal bulletins are entitled to "substantial weight" under *Skidmore v. Swift & Co.*, which held that although informal agency determinations are not binding on courts, they can still receive a measure of deference that is proportional to their "power to persuade."  323 U.S. 134, 139–40 (1944); *see also* Def.'s Opp'n at 16–17.  In contrast, UnitedHealth Group argues that no-action letters should be afforded minimal weight under *Skidmore*, as the letters "are not binding on anyone, not even on the SEC itself, and generally do not contain a reasoned explanation for the decision."  Def.'s Opp'n at 17.  Mission Fund does not appear to disagree that legal bulletins and no-action letters can provide direction to this Court under *Skidmore*.  Nevertheless, both parties downplay the persuasiveness of staff guidance that favors their opponent.  *See, e.g.*, Pl.'s Reply at 3; Def.'s Opp'n at 36.  The D.C. Circuit has not weighed in on the issue, but the Third Circuit has reasoned that no-action letters deserve "careful consideration" because they "represent[] the views of persons who are continuously working with the provisions of the [regulation] involved."  *Trinity Wall St.*, 792 F.3d at 342 n.11 (citation modified).

*     *     *

Because the parties agree that the SEC's interpretive releases are entitled to *Auer* deference, the Court will, at this stage, evaluate Mission Fund's proposal primarily by reference to the releases, although it will also consider the legal bulletins and no-action letters cited by the parties.  *Cf. As You Sow*, 2026 WL 879666, at *7.  As discussed, though, the 1976 and 1998 Releases are in some tension with one another: whereas the former suggests that a proposal cannot be excluded if it "involve[s] *any* substantial policy," *see* 1976 Release, 41 Fed. Reg. at 52998 (emphasis added), the latter states that a proposal must "*focus*[] on sufficiently significant social policy issues" to escape the ordinary business exclusion, *see* 1998 Release, 63 Fed. Reg. at

15

29108 (emphasis added).  Mission Fund suggests that the 1976 Release's interpretation presently reflects Rule 14a-8(i)(7)'s intent.  *See* Pl.'s Mot. at 13–14.  It observes that the SEC determined, under that standard, that a shareholder proposal for a utility not to construct a nuclear power plant was not excludable because the proposal involved major economic and safety considerations, even though the utility argued that the selection of a fuel source was an ordinary business matter.  *Id.* at 13 (citing 1976 Release, 41 Fed. Reg. at 52998).  Nevertheless, Mission Fund does not seriously contend that the 1976 Release's interpretation controls over the 1998 Release's interpretation; in fact, it later cites the 1998 Release and argues that its proposal "easily meets" the standard set forth therein.  Pl.'s Mot. at 14.  Therefore, for purposes of Mission Fund's preliminary injunction motion, the Court adopts the 1998 Release's standard.  And under that standard, it finds that although Mission Fund's proposal raises significant policy issues, the Court cannot conclude, on the current record, that the proposal "focus[es]" on those issues.  1998 Release, 63 Fed. Reg. at 29108.

### 2.  Mission Fund's Proposal

As noted, Mission Fund seeks to put to a shareholder vote whether UnitedHealth Group's Board of Directors should "publish a report . . . describing the healthcare consequences of its acquisitions over the past 10 years."  Mission Fund Proposal at 1.  Mission Fund argues that UnitedHealth Group has not demonstrated "that [this] proposal may properly be omitted in reliance upon" Rule 14a-8(i)(7), *see* 1976 Release, 41 Fed. Reg. at 52997, because the proposal "raises a 'significant' issue . . . without 'micromanaging' UnitedHealth's operations," *see* Pl.'s Mot. at 15–21.  According to Mission Fund, the "significant" policy issue raised is "the impact on healthcare of UnitedHealth's aggressive acquisition strategy."  Pl.'s Mot. at 15.  Furthermore, because its proposal does not ask UnitedHealth Group "to take any specific action other than

16

prepare a report," Mission Fund argues that it does not impermissibly seek to micromanage the company.  *Id.* At this early stage, however, Mission Fund has not made a "clear showing" that it is likely to succeed in establishing that its proposal lies beyond the scope of the ordinary business exclusion.  *Winter*, 555 U.S. at 22.

Starting with the first consideration discussed in the 1998 Release, a company is entitled to exclude a proposal whose "subject matter" involves a matter of "ordinary business," unless the proposal "focus[es] on sufficiently significant social policy issues" such that it "transcend[s] the day-to-day business matters" of the company.  63 Fed. Reg. at 29108.  Whether a proposal calling for a report is excludable turns on "whether the subject matter" of the report "involves a matter of ordinary business."  1983 Release, 48 Fed. Reg. 38221.  Here, Mission Fund does not appear to dispute that its proposed report would concern UnitedHealth Group's business matters—namely, the company's acquisitions.  As UnitedHealth Group observes, "healthcare *is* UHG's business," and to accomplish its business goals, it "frequently engages in ordinary-course transactions," *see* Def.'s Mot. at 1–2, including "investments, acquisitions, divestitures, strategic alliances, joint ventures[,] and outsourcing transactions" across its interrelated lines of business, *see id.*, Decl. of Matthew J. Porpora Ex. A, 2025 UHG Form 10-K at 15, ECF No. 9-3.  Instead, Mission Fund contends that the subject of its requested report—the "impact on healthcare of UnitedHealth's aggressive acquisition strategy"—is a significant policy issue that "transcend[s]" those ordinary-course transactions.  Pl.'s Mot. at 15.

In support of that contention, Mission Fund explains in its briefing that after the enactment of the Affordable Care Act in 2010, the healthcare sector underwent profound regulatory changes, to which UnitedHealth Group responded "by engaging in an aggressive strategy of 'vertical integration.'"  *Id.*  Mission Fund relates that over the past decade in

particular, UnitedHealth Group "has evolved from a small U.S. health insurer to a massive health care conglomerate" through its "strategic acquisitions," which have allowed it to branch out of its traditional role as an insurer and establish dominant positions in other sectors of the healthcare industry.  *Id.* at 15–16 (quoting *Sunshine Report on UnitedHealth Group*, Ctr. for Health & Democracy (2025), https://www.sunlightreportinsurance.com/about [https://perma.cc/765W-D7UQ]).  As a result, UnitedHealth Group "now employs or has close contractual ties with . . . nearly 10% of the entire U.S. physician workforce" and "commands 15% of the U.S. health insurance market."  *Id.* (quoting *Sunshine Report on UnitedHealth Group*).  While the "economic logic" of UnitedHealth Group's "vertical integration strategy . . . may be sound in theory," Mission Fund asserts that its proposed report will help shareholders understand how the company's acquisitions have impacted the cost and quality of the healthcare services that it provides to Americans.  Pl.'s Reply at 3–5.

The Court does not disagree that rising healthcare costs and unequal patient outcomes, among other concerns Mission Fund raises, are significant social policy issues.  And UnitedHealth Group's "aggressive vertical integration strategy" may very well have produced systemic and measurable effects across multiple dimensions of the healthcare system that are proper for shareholder consideration.  But despite Mission Fund's assertions in its briefing, its proposal does not, strictly speaking, request a report on the consequences of UnitedHealth Group's "vertical integration strategy."  *Id.* at 3.  The Court does not mean to nitpick the language of Mission Fund's proposal.  But it must nevertheless assess the substance of the request that Mission Fund hopes to put to a shareholder vote: that UnitedHealth Group publish a report "describing the healthcare consequences of its acquisitions over the past 10 years."  Mission Fund Proposal at 1.  On the record before it, the Court is not in a position to conclude

18

that a report addressing the "healthcare consequences" of UnitedHealth Group's "acquisitions" generally over the last decade—as opposed to specifically identified consequences of its vertical integration strategy or of specifically identified acquisitions or categories of acquisitions— "*focus*[*es*]" on significant policy issues that transcend UnitedHealth Group's ordinary business operations. 1998 Release, 63 Fed. Reg. at 29108 (emphasis added).

Specifically, the Court shares UnitedHealth Group's concern that a proposal calling for a report on the healthcare consequences of the company's acquisitions, "without any limitation based on the size of the acquisition, its importance to UHG, or the magnitude of its potential 'healthcare consequences,'" could excessively sweep in mundane aspects of UnitedHealth Group's acquisitions and thus fall within Rule 14a-8(i)(7)'s ambit. Def.'s Opp'n at 24. The D.C. Circuit's opinion in *Grimes* lends supports to that view. In that case, the D.C. Circuit approved a company's reliance on the ordinary business exclusion to omit a proposal to limit the company's capital expenditures in a given year to no more than the amount of dividends paid to shareholders in the prior year. *Grimes*, 909 F.2d at 529–30. While acknowledging that the SEC staff had previously "found a proposal relating to capital expenditures to be sufficiently important to remove it from the realm of 'ordinary business operations,'" the D.C. Circuit reasoned that the proposal at issue did not meet that threshold because it "potentially extend[ed] to capital expenditures of any kind[,] . . . no matter how small." *Id.* at 532. Here, similarly, Mission Fund's proposal extends to UnitedHealth Group's "acquisitions" generally, yet Mission Fund has not explained why the Court should accept that most of them involved significant healthcare consequences. Mission Fund Proposal at 1. Indeed, UnitedHealth Group represents that "many" of its acquisitions were "fairly small and routine" or "had no direct involvement in care delivery." Choudhry Decl. ¶ 9.

19

Mission Fund assures the Court in its briefing that its proposal does not seek "a microscopic analysis of every acquisition that UnitedHealth Group has undertaken over the past ten years." Pl.'s Reply at 3. To be sure, Mission Fund's supporting statement describes the "strategy of vertical integration" that UnitedHealth Group has pursued in recent years, as well as the risks that vertical integration creates for the healthcare system. Mission Fund Proposal at 1. Yet it is not evident from the language of Mission Fund's proposal or its supporting statement that the proposal seeks a report limited to the healthcare consequences of UnitedHealth Group's broader vertical integration strategy. Elsewhere in the supporting statement, in fact, Mission Fund insists that shareholders deserve to understand "the broader impact of UHG's acquisitions." *Id.* at 2; *see also* Pl.'s Reply at 3–4 (suggesting that the report could explore "the broader consequences" of UnitedHealth Group's vertical integration strategy, including "where [it] has . . . left the Company [and] its shareholders"). Ultimately, the Court believes that the most natural reading of Mission Fund's proposal—and the one that shareholders would understand themselves to be voting on—is that it calls for UnitedHealth Group to review all of its acquisitions over the past decade and analyze their healthcare consequences.

Notably, Mission Fund's proposal contrasts with a separate shareholder proposal it cites involving HCA Healthcare, Inc. ("HCA") that the SEC staff determined could not be excluded on ordinary business grounds. *See* HCA Healthcare, Inc., SEC Staff No-Action Letter (Mar. 10, 2025) ("HCA No-Action Letter"), https://www.sec.gov/files/corpfin/no-action/mayfieldhca31025-14a8.pdf [https://perma.cc/J8TC-P955]. This latter proposal requested that HCA's "Board of Directors publish a report . . . describing the healthcare consequences of its acquisition strategy and the impact its hospital acquisitions within the last 10 years have had on impacted communities." *Id.* at 3. HCA sought to exclude the proposal under Rule 14-8a(i)(7),

but the SEC staff denied it relief via a no-action letter.[4]  *See id.* at 1.  The SEC staff explained

that it was "unable to concur in [HCA's] view that the Company may exclude the Proposal under

Rule 14a-8(i)(7)" because, in the SEC staff's view, "the Proposal transcends the Company's

ordinary business operations and does not seek to micromanage the Company."  *Id.*  Mission

Fund argues that because its requested report is "essentially the same" as the one contemplated in

the HCA proposal, the Court should find, as the SEC staff found in the HCA No-Action Letter,

that its proposal is not excludable under Rule 14a-8(i)(7).  Pl.'s Mot. at 21–23.

The Court declines to do so now.  According to the 1998 Release, determinations as to

whether a proposal relates to a company's ordinary business operations are made "on a case-by-

case basis, taking into account factors such as the nature of the proposal and the circumstances of

the company to which it is directed."  63 Fed. Reg. at 29109.  Although Mission Fund's proposal

is worded similarly to the HCA proposal—and may have even been modeled after it, *see* Dec.

15, 2025 Letter at 1—the nature of the two proposals and the circumstances under which they

were presented appear to differ.  Recall that the HCA proposal sought a report on the healthcare

consequences of HCA's "acquisition strategy," with a focus on "the impact of its hospital

acquisitions."  HCA No-Action Letter at 3.  That proposal identified specific metrics by which to

measure this impact, including "the number of physician departures post-acquisition," "a

comparison of pre[-] and post-acquisition patient satisfaction ratings," and "the number of staff

per occupied beds pre[-] and post-acquisition."  *Id.*  Furthermore, the policy issue raised was

clearly "significan[t] in relation to the company."[5]  SEC Staff Legal Bulletin No. 14M § C.2

---

[4] The SEC staff issued the HCA No-Action Letter in March 2025, while it was still offering substantive feedback on companies' Rule 14-8a submissions.  *See supra* note 2.

[5] UnitedHealth Group urges the Court to disregard the HCA No-Action Letter because in it, the SEC staff allegedly applied a legal framework that has now been rescinded.  *See* Def.'s Opp'n at 34.  Specifically, when HCA submitted its Rule 14-8a inquiry to the SEC staff, SEC

(Feb. 12, 2025). As described in the proposal's supporting statement, after HCA acquired one particular hospital in 2019, over 200 physicians left that hospital, and HCA allegedly raised prices, started charging patients surprise fees, and reduced the number of staff per occupied bed at that hospital. *See* HCA No-Action Letter at 3. Here, in contrast, Mission Fund's proposal extends to the "healthcare consequences" of UnitedHealth Group's "acquisitions" generally. Mission Fund Proposal at 1. And although Mission Fund also suggests several metrics by which to gauge those consequences, *see* Mission Fund Proposal at 2, Mission Fund does not justify the relevance of evaluating all of UnitedHealth Group's acquisitions over the past decade against those metrics—at least not in a manner that would permit the Court, at this point, to assess the "significance" of those metrics "in relation to the company." SEC Staff Legal Bulletin No. 14M § C.2.

Because the Court cannot conclude that the subject matter of Mission Fund's proposal "focus[es]" on a significant policy issue that "transcend[s]" UnitedHealth Group's ordinary business operations, the Court only briefly examines the 1998 Release's second consideration:

---

Staff Legal Bulletin No. 14L was in effect. That bulletin directed the SEC staff to determine whether a proposal related to ordinary business by considering only "whether the proposal raises issues with a broad societal impact," regardless of whether those issues were significant to the particular company. SEC Staff Legal Bulletin No. 14L § B.2 (Nov. 3, 2021). But when the SEC staff issued the HCA No-Action Letter a few months later, SEC Staff Legal Bulletin No. 14L had been replaced with SEC Staff Legal Bulletin No. 14M, which now instructs the SEC staff to additionally consider a policy issue's "significance in relation to the company." SEC Staff Legal Bulletin No. 14M § C.2. UnitedHealth Group argues that the HCA No-Action Letter presumably applied the standard from SEC Staff Legal Bulletin No. 14L, while Mission Fund insists that it applied the current standard from SEC Staff Legal Bulletin No. 14M, and that this Court can therefore consider the Letter. *See* Pl.'s Mot. at 22 n.1.

The Court will not disregard the HCA No-Action Letter. For starters, the Letter's sparse reasoning does not reveal which standard the SEC staff applied. And even if the SEC staff applied the rescinded standard, it is clear that the HCA proposal also satisfies the current standard. As explained above, the healthcare consequences of HCA's hospital acquisitions are plainly significant to HCA, which, as described in the HCA proposal, has previously dealt with substandard outcomes from a prior hospital acquisition.

22

the "degree to which the proposal seeks to 'micro-manage' the company." 63 Fed. Reg. at 29108. UnitedHealth Group argues that Mission Fund's proposal attempts to micromanage the company because it demands "intricate detail[s]" about the company's business operations and "prob[es] too deeply into matters of a complex nature" that are not suitable for shareholder consideration. Def.'s Opp'n at 28–33 (quoting 1998 Release, 63 Fed. Reg. at 29108). As to the first point, the Court sees how a proposal might micromanage a company if it demands an extensive assessment of its acquisitions over a ten-year period. But Mission Fund's proposal is imprecise as to the nature and amount of information that should be in the report. UnitedHealth Group might otherwise fault Mission Fund for its "vague" proposal, *see* Def.'s Opp'n at 20, but with respect to micromanagement, it is not clear to the Court how that characteristic renders the requested report "unduly" intrusive, *see* 1998 Release, 63 Fed. Reg. at 29109.

UnitedHealth Group's second point is not much stronger. Although the Court does not doubt that UnitedHealth Group's acquisitions involve "complex, fact-specific and continuous managerial judgments" about "capital allocation," "financing structures," and timing and growth considerations that are "ill-suited for shareholder decision-making," *see* Def.'s Opp'n at 29, Mission Fund is not seeking a report about those judgments. Mission Fund is seeking a report about the "healthcare consequences" of UnitedHealth Group's acquisitions. Mission Fund Proposal at 1. The Court takes UnitedHealth Group's point that the breadth of Mission Fund's request, along with its citations to inaccurate statistics, *see, e.g.*, *supra* note 1, appear to reflect its incomplete understanding about UnitedHealth Group's operations. But at this point, the Court is not prepared to conclude that Mission Fund's requested report would force UnitedHealth Group to scrutinize arcane managerial judgments, or that the healthcare consequences of the company's acquisitions are beyond shareholders' grasp or concern. *See, e.g.*, HCA No-Action Letter at 1

(opining that a proposal for a report on the healthcare consequences of HCA's hospital acquisitions "does not seek to micromanage the Company").

\* \* \*

Even if Mission Fund's proposal does not seek to micromanage the company, UnitedHealth Group is entitled to exclude it from its proxy materials if it does not "focus" on a significant policy issue that "transcend[s] the day-to-day business matters" of the company. 1998 Release, 63 Fed. Reg. at 29108; *see also* SEC Staff Legal Bulletin No. 14M at Annex A (noting that according to the 1998 Release, a proposal can be excludable under one consideration but not the other).  Because it is not clear that Mission Fund's proposal "focus[es]" on such an issue,[6] Mission Fund has not established a likelihood of success on the merits or, consequently, its entitlement to emergency relief.[7]  1998 Release, 63 Fed. Reg. at 29108.

---

[6] Besides arguing that Mission Fund's proposal does not "focus" on a significant policy issue, UnitedHealth Group contends that Mission Fund's proposal is also excludable because the "healthcare consequences" of the company's acquisitions are "not an issue that 'transcend[s] the day-to-day business matter[s]' of a healthcare company such as UHG."  Def.'s Opp'n at 25 (quoting 1998 Release, 63 Fed. Reg. at 29108).  That is, according to UnitedHealth Group, "[m]anaging healthcare consequences is at the core of what UHG does as a business," so a report about healthcare consequences "would not transcend UHG's ordinary business operations but instead focus directly on them."  *Id.* at 27.  In advancing this contention, UnitedHealth Group cites the Third Circuit's majority opinion in *Trinity Wall St.* for the proposition that an issue must be "divorced from how a company approaches the nitty-gritty of its core business" to qualify as a "significant" and transcendent issue.  792 F.3d at 347.  Nevertheless, as explained above, *see supra* note 3, the SEC staff has rejected that approach, opining that "a proposal may transcend a company's ordinary business operations *even if* the significant policy issue relates to the 'nitty-gritty of its core business.'"  SEC Staff Legal Bulletin No. 14H § C (emphasis added) (quoting *Trinity Wall St.*, 729 F.3d at 347).  The Court need not delve into this issue now because, in any event, it has not found that Mission Fund's proposal focuses on a significant policy issue.

[7] UnitedHealth Group argues that Mission Fund's request for a preliminary injunction is further barred by the doctrine of laches, because Mission Fund waited over a month to file its case after learning that the SEC would not object to UnitedHealth Group's exclusion of its proposal.  *See* Def.'s Opp'n at 39–40.  "Laches is the principle that equity will not aid a plaintiff whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant."  *Kemp v. Eiland*, 139 F. Supp. 3d 329, 349 (D.D.C. 2015) (citation omitted); *see also Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary

### B. Permanent Injunction

Although Mission Fund has not made a "clear showing" that it is likely to succeed on the merits of its claim, *see Winter*, 555 U.S. at 22, the Court declines UnitedHealth Group's invitation to reach the merits and, on the current record, dismiss Mission Fund's claim with prejudice. As in *As You Sow*, the parties here "have yet to reckon with significant and potentially outcome-determinative interpretive questions." 2026 WL 879666, at *9. One such question is whether a proposal must "focus" on a significant issue, *see* 1998 Release, 63 Fed. Reg. at 29108, or instead merely "involve any substantial policy or other consideration," *see* 1976 Release, 41 Fed. Reg. at 52998, to fall outside of Rule 14-8a(i)(7)'s reach. Another question is whether Mission Fund has a private right of action under Rule 14a-8 to bring this suit, which the parties only briefly touch on. *See* Def.'s Opp'n at 18 & n.9; Pl.'s Reply at 12. Ultimately, the Court cannot foreclose the possibility that, upon further briefing, Mission Fund may persuade it that its proposal does not "deal[] with a matter relating to [UnitedHealth Group's] ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). The Court therefore denies Mission Fund's motion for a permanent injunction without prejudice. UnitedHealth Group remains free to move to dismiss Mission Fund's complaint, as it represents that it initially intended to do.

### V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction (ECF No. 2) is **DENIED**, and Plaintiff's Motion for a Permanent Injunction (ECF No. 2) is **DENIED** without

---

injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."). Although the Court is not pleased by Mission Fund's delay, it need not consider UnitedHealth Group's alternative laches argument because it is denying Mission Fund's preliminary injunction motion based on a failure to show a likelihood of success on the merits.

prejudice.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  April 15, 2026                                              RUDOLPH CONTRERAS
                                                                              United States District Judge